**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| National Trust for Historic Preservation, et al., | No. CV-13-01973-PHX-DGC |
| Plaintiffs, | **ORDER** |
| v. | |
| Raymond Suazo, et al., | |
| Defendants. | |

This case involves the Bureau of Land Management's decision to allow recreational target shooting throughout the Sonoran Desert National Monument. Plaintiffs claim that this decision will lead to irreversible damage to the diverse wildlife and precious artifacts of the Monument. Plaintiffs claim that Defendants have violated their duty under the Federal Land Policy and Management Act to protect the Monument, and that Defendants' environmental impact statement fails to comply with the National Environmental Policy Act.

The parties have filed motions for summary judgment. Docs. 32, 35. The motions are fully briefed, and the Court heard oral argument on March 25, 2015. The Court will grant Plaintiffs' motion on two of their claims, vacate the portion of the BLM decision that relates to recreational shooting, and remand that portion to BLM for further consideration in light of this order.

/ / /

## I.     Background.

"The President of the United States is authorized, in his discretion, to declare by public proclamation historic landmarks . . . and other objects of historic or scientific interest that are situated upon the lands owned or controlled by . . . the United States to be national monuments[.]"   16 U.S.C. § 431.   On January 17, 2001, President Clinton exercised this power and signed a presidential proclamation ("Proclamation") establishing the Sonoran Desert National Monument ("Monument"), which comprises almost 500,000 acres of Southern Arizona.  A.R. 870-73; 66 Fed. Reg. 7354.

The President described the Monument as a "magnificent example of untrammeled Sonoran desert landscape" with "distinct mountain ranges separated by wide valleys[.]" A.R. 870.  The President noted the "spectacular diversity of plant . . . species," including forests of saguaro cacti, palo verde trees, endangered acuna cacti, and "a variety of herbaceous plants."   *Id.*   The Monument also features a wide variety of wildlife, including Sonoran pronghorns, desert bighorn sheep, javelina, Sonoran desert tortoises, and several species of owls.  A.R. 871.  The President described the Monument's "many significant archaeological and historic sites, including rock art sites, lithic quarries, . . . scattered artifacts," and the Juan Bautista de Anza National Historic Trail.  *Id.*

The President set apart and reserved, "for the purpose of protecting the objects identified above," the specified lands as the Sonoran Desert National Monument.  *Id.* The President directed the "Secretary of the Interior [to] manage the Monument through the Bureau of Land Management, pursuant to applicable legal authorities, to implement the purposes of this proclamation . . . [and to] prepare a management plan that addresses the actions . . . necessary to protect the objects identified in this proclamation."  A.R. 872.

On April 24, 2002, the Bureau of Land Management ("BLM") published in the federal register a notice of its intent to prepare a resource management plan ("RMP") and an environmental impact statement ("EIS") for the Monument.  A.R. 962.[1]  BLM invited

---

[1]  The EIS analyzed environmental impacts on the Monument and on the Lower Sonoran Desert, an area adjacent to the Monument for which BLM issued a separate RMP.  BLM's decisions regarding the Lower Sonoran Desert are not at issue in this case.

Indian tribes, government agencies, and the public to participate in this process. A.R. 1015-44.  BLM received thousands of letters and comments.  A.R. 3245-553, 4209-351 ("Scoping Report").   An issue that quickly emerged was how to address the recreational target shooting that was taking place throughout the Monument.  A.R. 4090, 4264, 6315.  As BLM later put it, "[s]hooting activities including 'target shooting,' 'shooting practice,' 'plinking,' 'sporting clays,' 'skeet,',' and 'sighting-in' have been occurring in the [Monument] since firearms were introduced to the region. . . . Increasingly, Arizona's broad public demand for places to shoot is being shifted to public lands managed by the BLM." A.R. 14464-65.  BLM decided to evaluate the effects of shooting on Monument objects and the areas where shooting might be appropriate. A.R. 4264-65.

In February of 2005, Professor Pam Foti completed a report for BLM that analyzed the impacts of recreational shooting on the Monument.  A.R. 6591.  The report found that shooting was occurring on 69 of the 348 sites in the Monument that were surveyed.  A.R. 6607.  Approximately 28 of these 69 sites had damage to saguaro cacti, with the damage being "extreme" in 16 of the sites.  A.R. 6614.  Additionally, there was evidence of shooting on approximately 50 percent of the sites within the Monument identified as "extremely" and "heavily" impacted by human activity.  A.R. 6619-20.  As BLM prepared the Draft RMP and EIS, it continued to analyze and discuss the impacts of and solutions for recreational shooting.  A.R. 10939-942, 11302-3950.

In August of 2011, BLM published its Draft RMP and EIS (collectively, the "Draft EIS").  A.R. 14061.  The Draft EIS laid out five alternative plans for managing the Monument.   A.R. 14096-100, 14146-55; *see* 40 C.F.R. § 1502.14.    With respect to shooting, the alternatives ranged from allowing shooting throughout the Monument to prohibiting it entirely.  A.R. 14151-55, 14292.  The Draft EIS highlighted a number of concerns arising from recreational shooting in the Monument, including "the health and safety of visitors," "[a]ccumulation of abandoned household refuse used as targets," the "gradual degradation or destruction of natural resources," the use of signage and

structures for targets, and damage to trees and plants.  A.R. 14465.  The Draft EIS found that allowing recreational shooting throughout the Monument caused moderate impacts to cultural, soil, and water resources, as well as to wilderness characteristics, wildlife, and public safety.[2]  A.R. 15022-61.  The Draft EIS noted that during "October-November 2008, the BLM removed 12,000 pounds of debris from recreational target shooting sites adjacent to the northern boundary of the Monument."  A.R. 14466.

Appendix G to the Draft EIS included a formal analysis of the effects of recreational shooting.  A.R. 15306-339.  That "analysis was undertaken to determine areas of the [Monument] where continued recreational target shooting would cause unacceptable impact to the objects for which the [Monument] was designated, as well as to identify areas where such activity is compatible with such objects."  A.R. 15306.  Based on potential impacts on Monument "objects" – including the "palo verde-mixed cacti vegetation community," the habitat of the Sonoran desert tortoise, and the Juan Bautista de Anza Historic Trail – the first phase of the analysis concluded that 80.2% of the Monument was unsuitable for recreational shooting.  A.R. 15314.  The analysis then examined the remaining areas of the Monument for the "presence of monument objects," potential safety issues, motor vehicle access, and the suitability of the areas for target shooting.  A.R. 15309-16.  The analysis concluded "that shooting activity, for reasons of potential impacts to Monument objects, visitor safety, accessibility, and physical suitability of terrain, would likely be limited to one area, the Hidden Valley (C) location."  A.R. 15316.  Because making this area available for shooting would be impractical, and because "BLM does not compromise on the safety of its visitors," the Appendix G analysis recommended that recreational shooting be prohibited throughout the Monument.  *Id.*  The Draft EIS adopted this recommendation.  A.R. 14154-55, 14292.[3]

---

[2] In a "moderately" impacted area, "[d]irect effects are readily apparent and measurable over a larger area, but are still mainly within the footprint of the action.  Indirect effects are apparent and measurable, but do not exceed much beyond the footprint of the action.  Objects may be affected on site and in the vicinity of the activity, but are maintained within the Monument."  A.R. 14491.

[3] In a briefing paper, a BLM employee explained that "we determined, based on

After publication of the Draft EIS, the required 90-day public comment period began.  A.R. 23750.  BLM also held eight public meetings.  *Id.*  Many persons and organizations submitted comments protesting BLM's decision to ban recreational shooting in the Monument.  A.R. 21431-35, 21449, 21500, 21550-51, 21556-68.  BLM drafted responses to these comments and planned to stand by its decision to ban shooting throughout the Monument.  A.R. 19087 ("No comments received pertaining to target shooting caused us to reconsider the alternatives or the decision in the Proposed Alternative."), 19789, 20153-65 (comments and drafted responses).  By April 2012, BLM had prepared the Proposed RMP and Final EIS (collectively, the "Final EIS"), which included the ban on shooting.  A.R. 20141-43.  The Final EIS had been sent to the printer and provided to the EPA for publication in the Federal Register.  A.R. 20142.  Then, on April 27, 2012, BLM received a directive from the Washington, D.C. office of the Department of the Interior ("DOI") that the Final EIS must be changed to allow for recreational shooting throughout the Monument.  *Id.*; A.R. 20124-25.

Although it appears that no reason was given by DOI at the time, subsequent BLM documents state that the change resulted from DOI's consultation with the Wildlife and Hunting Heritage Conservation Council, an advisory group established under the Federal Advisory Committee Act, and "feedback from the National Rifle Association and local shooting enthusiasts in support of keeping the monument open for recreational target shooting."  A.R. 20175.  Nothing in the record cited by the parties suggests that the change resulted from an evaluation of the information and data collected in the Draft EIS or the Final EIS.

Some BLM employees thought the DOI directive was not consistent with the Proclamation's mandate to protect Monument objects. A.R. 20124, 20127.  Nevertheless,

---

BLM staff assessment and independent university research, that recreational target shooting was causing substantial damage to monument resources, particularly to vegetation and rocky areas, and in some cases to rock art.  We further determined that this damage was long-term, likely in the 100 year or greater range due to the preponderance of damage to long-live and slow-growing species such as saguaro." A.R. 10941.

in June of 2012, BLM published the Final EIS with the change.  A.R. 20278.  Identifying recreational shooting as an "important recreational activity" in the Monument for which "use has increased dramatically during the past five years," the Final EIS announced that recreational shooting would be allowed throughout the Monument.   A.R. 20382-83; 20574.  To mitigate the damage that shooting was causing to Monument objects, the Final EIS outlined "a comprehensive suite of administrative actions and best management practices."  A.R. 20383.  These included coordinating with the shooting community to develop a "comprehensive, activity-level recreation" plan for shooting, disseminating educational materials and signs to inform the public about best-shooting practices, dedicating law enforcement personnel to deter illegal shooting practices, and monitoring shooting areas for improper activity.  A.R. 20576-77.  The Final EIS also proposed a list of supplementary rules that "may" be issued in the future, such as restricting shooting to daylight hours, restricting the types of targets for shooting, and requiring persons to remove all debris produced by target shooting.  *Id.*; *see also* A.R. 22083-86 (proposing best management practices for target shooting).

The Final EIS retained Appendix G from the Draft EIS and its analysis of the effects of recreational shooting in the Monument, as well as its suggestion that shooting be prohibited throughout the Monument.  A.R. 22026-52.  The Final EIS also repeated the Draft EIS's conclusion that allowing recreational shooting would cause moderate impacts to a variety of resources.  *See* A.R. 20800-21385.  For example, the document stated that "[i]mpacts could include but are not limited to the direct loss, mortality or injury of individual animal species and avoidance of traditional habitats while target shooting is taking place."  A.R. 21032.  The Final EIS stated, however, that these moderate impacts should greatly decrease "if Management and Administrative Actions designed to change the conduct of recreational target shooters has [sic] the desired effect[.]"  A.R. 20864-65, 20895, 20966, 21005, 21052.

After publication of the Final EIS, BLM received protest letters about its decision to allow recreational shooting.  A.R. 24259-60.  In response, BLM repeated its intent to

allow shooting and to implement "a suite of administrative actions and best management practices to minimize the adverse impacts of recreational target shooting."  A.R. 24262. In September of 2012, BLM published its Record of Decision and Approved Resource Management Plan ("ROD").  A.R. 23722.  The ROD affirmed the decision to allow shooting throughout the Monument and reiterated the administrative actions BLM would take to mitigate the effects of shooting.  A.R. 23829-32.

On September 27, 2013, Plaintiffs Archaeology Southwest, Wilderness Society, and National Trust for Historic Preservation filed this lawsuit.  Doc. 1.  They sued BLM, DOI, and Raymond Suazo in his official capacity as Arizona State Director of BLM.  *Id.* Plaintiffs claim that these Defendants have violated the Proclamation, the Federal Land Policy and Management Act ("FLPMA"), the National Historic Preservation Act ("NHPA"), the Administrative Procedure Act ("APA"), and the National Environmental Policy Act ("NEPA").  *Id.* at 15-18.  Plaintiffs seek summary judgment on their claims under FLPMA, NEPA, and the APA (Doc. 32), and Defendants request summary judgment on these same claims (Doc. 35).[4]

## II.    **Standard of Review.**

The APA governs the Court's review of BLM's compliance with NEPA and FLPMA.  *W. Watersheds Project v. Abbey*, 719 F.3d 1035, 1041 (9th Cir. 2013).  The Court may set aside an agency action under the APA only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A). Agency action should be overturned only when the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State*

---

[4] Plaintiffs appear to have abandoned their claim under the NHPA.  They do not seek summary judgment on that claim, and they ask the Court to grant summary judgment on their other claims, vacate the shooting portion of the ROD, and remand that portion to BLM.  They do not suggest that the NHPA claim should remain in the case. The Court will not address the NHPA claim.

*Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  "This standard of review is highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision." *Nw. Ecosystem Alliance v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007) (internal quotes and citation omitted).  Summary judgment is an appropriate mechanism for reviewing final agency actions because the issues for resolution are those of law.  *Occidental Eng'g Co. v. I.N.S.*, 753 F.2d 766, 770 (9th Cir. 1985).  The Court's review is limited to the administrative record, to which the parties in this case have stipulated (Docs. 34 at 2, 36 at 2).  *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1472 (9th Cir. 1994).

## III.   FLPMA and the Proclamation.

Plaintiffs argue that BLM's decision to allow recreational shooting throughout the Monument violates FLPMA and the Proclamation because the decision fails to protect the objects of the Monument.  The Court agrees.[5]

### A.   Legal Standards.

FLPMA governs BLM's management of public lands.  *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 58 (2004); *see Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 875-77 (1990) (explaining history of FLPMA).  "FLPMA requires that BLM, under the Secretary of the Interior, 'develop, maintain, and when appropriate, revise land use plans' to ensure that land management be conducted 'on the basis of multiple use and sustained yield.'"  *Klamath Siskiyou Wildlands Ctr. v. Boody*, 468 F.3d 549, 555 (9th Cir. 2006) (quoting 43 U.S.C. §§ 1701(a)(7), 1712(a)).  "This multiple-use-and-sustainable-yield mandate guides BLM's management of public lands 'except that where a tract of such public land has been dedicated to specific uses according to any other provisions of law it shall be managed in accordance with such law.'"  *W. Watersheds Project*, 719 F.3d at 1042 (quoting 43 U.S.C. § 1732(a)).  Under this provision, BLM must manage the

---

[5] Plaintiffs bring separate claims for violation of FLPMA and the Proclamation.  Doc. 1, ¶¶ 79-91.  In their motion for summary judgment, Plaintiffs state that because FLPMA "incorporates the Proclamation's terms, this Court need not consider whether the Proclamation itself is subject to judicial review."  Doc. 33 at 18.  The Court therefore will treat these claims as duplicative.  Both claims seek relief under FLPMA.

1  Sonoran Desert National Monument in compliance with the terms of the Proclamation.

2  *Id.*

3  As discussed above, the Proclamation directs BLM to protect the "objects" of the

4  Monument "pursuant to applicable legal authorities."  A.R. 871-72; 66 Fed. Reg. 7354.

5  The Proclamation also describes the protection of Monument objects as "paramount."

6  A.R. 872.  The Court agrees with Defendants that the Proclamation's requirement to

7  protect objects "pursuant to applicable legal authorities" means that BLM may manage

8  the Monument with an eye towards multiple-use principles.  *See In re Mont. Wilderness*

9  *Ass'n*, 807 F. Supp. 2d 990, 996 (D. Mont. 2011) ("The interpretation that providing for

10  multiple use was required so long as Monument objects were protected was

11  reasonable."), *rev'd on other grounds*, 725 F.3d 988 (9th Cir. 2013).  The Court also

12  finds that the Proclamation does not require BLM's management decisions to be those

13  that are the *most* protective of Monument objects.  Rather, the Proclamation requires that

14  BLM carefully balance the "paramount" purpose of protecting Monument objects with

15  other purposes and needs, such as allowing recreational activities in the Monument.

16  Reasonable persons may disagree as to whether BLM has appropriately balanced

17  these purposes.  The Ninth Circuit, therefore, has instructed that a court should give

18  "great deference" to an agency's interpretation of a presidential proclamation.  *W.*

19  *Watersheds Project*, 719 F.3d at 1042 (citing *Kester v. Campbell*, 652 F.2d 13, 15 (9th

20  Cir. 1981)); *see also Mont. Wilderness Ass'n v. Connell*, 725 F.3d 988, 994 (9th Cir.

21  2013).  BLM's interpretation of the Proclamation "must be reasonable, but 'need not be

22  the only reasonable interpretation.'"  *W. Watersheds Project*, 719 F.3d at 1042 (quoting

23  *Kester*, 652 F.2d at 16).  The Court will sustain BLM's interpretation of the Proclamation

24  unless the interpretation is "inconsistent with the Proclamation or contrary to other

25  applicable law."  *Id.* at 1045.

26  **B.      Analysis.**

27  For BLM's decision on recreational shooting to be upheld under the APA, the

28  Court must be able to find "'a rational connection between the facts found and the

decision made.'"  *Humane Soc. of U.S. v. Locke*, 626 F.3d 1040, 1048 (9th Cir. 2010) (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43).  Courts cannot sustain decisions that run "counter to the evidence in the record."  *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.  The Court concludes that the decision to allow recreational shooting throughout the Monument lacks a rational connection to the facts found through the EIS process.  The decision runs counter to the evidence in the record.

As recounted above, BLM commissioned a study on the effects of shooting at an early stage in the process of preparing the RMP.  A.R. 3796-97.  The study showed that recreational shooting was occurring on approximately 50 percent of the "extremely" and "heavily" impacted sites that were surveyed, and that there was significant damage to saguaro cacti.  A.R. 6614, 6619-20.  Based on this study and other information, BLM prepared a formal analysis of the effects of shooting – Appendix G – which was included in both the Draft EIS and the Final EIS.  This appendix explained that recreational shooting had resulted in "damage to protected plants, particularly saguaro; areas denuded of vegetation . . . accumulation of debris used as targets . . . [and risks to the] safety of other visitors."  A.R. 22026.  Its first-phase analysis found that 80.2% of the Monument was not suitable for recreational shooting, and its later phases found that most of the remaining 19.8% was also unsuitable.  A.R. 22034-37.  The appendix accordingly recommended that BLM consider alternatives in which "486,400 acres, or 100 percent, of the [Monument] will be unavailable for recreational target shooting."  A.R. 22037.

The Final EIS also found that allowing shooting would cause moderate impacts to cultural, soil, and water resources, as well as to wilderness characteristics, wildlife, and public safety.  A.R. 20846, 20875, 20950, 20979, 21032, 21257.  For example, the document stated that "[i]mpacts could include but are not limited to the direct loss, mortality or injury of individual animal species and avoidance of traditional habitats while target shooting is taking place."  A.R. 21032.

The Draft EIS and Final EIS evaluated five alternative plans.  A.R. 14151-55.  These plans ranged from prohibiting shooting altogether to allowing it on 0.2%, 20%, or

100% of the Monument.  *Id.*  All of the investigation and analysis performed before April 27, 2012, led BLM to conclude that shooting should be prohibited throughout the Monument.  BLM came to this conclusion several times, including after public hearings and comments.

Despite this evidence and history, the final document concluded that the entire Monument should be open to recreational shooting.  Defendants insist that this decision was reasonable because it included, for the first time, planned administrative actions to protect Monument objects as required by the Proclamation.  The administrative actions can be summarized as follows:

- Collaborating with adjoining landowners, local communities, interested individuals, and shooting enthusiasts to educate the public regarding appropriate shooting behaviors and to develop a "comprehensive, activity-level recreation plan[] for the [Monument]."  A.R. 20576.

- Disseminating educational materials and signage "to inform the public about how to conduct target shooting activities in ways that avoid impacts to . . . Monument objects."  *Id.*

- Dedicating sufficient law enforcement personnel "to assure continued illegal conduct will cease and Monument objects will be protected."  *Id.*[6]

- Monitoring of shooting sites so as "to assure future protection of Monument objects and to inform appropriate changes in Monument management.  A.R. 20577.

- Possibly preparing supplementary rules that restrict shooting to daylight hours, limit the types of targets for shooting, and require persons to remove all debris produced by target shooting.  A.R. 20576-77.

BLM also prepared a list of "best management practices" for recreational shooters.  A.R. 22083-86, 23936-38.  These practices encourage shooters to select a site with a safe backstop, a downrange safety fan, and an appropriate distance from other visitors.  *Id.*

The administrative actions and best practices can be boiled down to educating the public, monitoring shooting sites, and possibly preparing additional rules in the future.

---

[6] Although the administrative actions include the dedication of "sufficient law enforcement" personnel to protect the Monument, the Final EIS makes clear that "implementation of these Administrative Actions will be subject to available funding and staffing."  A.R. 20577.  The Final EIS identifies no new funding for law enforcement.

They certainly aspire to protect the Monument, but there is nothing in the Final EIS to show they will be effective.  That is because BLM never evaluated their effectiveness in the Draft EIS or Final EIS.  They were added to the Final EIS after the shooting decision had been made in Washington, not before.

The Final EIS does state repeatedly that "*if* Management and Administrative Actions designed to change the conduct of recreational target shooters has [sic] the desired effect, impacts from recreational target shooting should be greatly decreased.  *If* that were[] to happen, impacts would be negligible to minor."  A.R. 20864-65, 20895, 20966, 21005, 21052 (emphasis added).  But this language simply confirms that the administrative actions are aspirational.  Damage to the Monument will decrease "if" the measures work.  No analysis suggests that they will work.  Indeed, the Monument is already operating under various regulations similar to the proposed administrative actions.  For example, an existing regulation states that no person shall "[w]illfully deface, disturb, remove or destroy any . . . archaeological or historic resource, natural object or area . . . [or] plants or their parts, soil, rocks or minerals."  43 C.F.R. § 8365.1-5(a)(1)-(2).  These regulations do not appear to have reduced damage to Monument objects from recreational shooting.

After fully considering the Final EIS and the ROD, the Court cannot conclude that BLM acted reasonably in opening the Monument to shooting.  There is simply too great an incongruity between the information contained in the Final EIS and the decision to allow shooting throughout the Monument.  The Final EIS finds ongoing and substantial damage to the Monument from shooting, while the decision allows shooting to continue freely.  There is no "'rational connection between the facts found and the decision made.'"  *Humane Soc.*, 626 F.3d at 1048 (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43).  This is a quintessential example of a decision that runs "counter to the evidence in the record."  *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.  And the incongruity is not lessened by the addition of administrative actions that have not been evaluated for effectiveness.

Although the Court's decision is based on the incongruity within the BLM documents and not the history of the BLM decision, the history does help explain the incongruity. BLM personnel decided after years of analysis that shooting should not be allowed in the Monument. That all changed on April 27, 2012, when DOI directed that the Monument be kept open to shooting. A.R. 20124-25, 20141-43. As already noted, BLM documents explain that the change resulted from DOI's consultation with the Wildlife and Hunting Heritage Conservation Council and "feedback from the National Rifle Association and local shooting enthusiasts in support of keeping the monument open for recreational target shooting." A.R. 20175. Nothing in the record cited by the parties suggests that the change resulted from an evaluation or reevaluation of information collected in the Draft EIS or Final EIS. It is not surprising, therefore, that BLM employees struggled to explain the new decision. *See* A.R. 20124 ("[T]he problem with [allowing shooting] is that it is inconsistent with the analysis in Appendix G and the finding that target shooting is incompatible with the Proclamation."); A.R. 20127 ("The proposed decision is one we have identified as incompatible with protection of monument objects over 80% of the monument.").

Defendants argue that BLM is permitted to change decisions. This surely is true, but "the agency must show that there are good reasons for the new policy." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). And if the "new policy rests upon factual findings that contradict those which underlay its prior policy," the agency must "provide a more detailed justification than what would suffice for a new policy created on a blank slate." *Id.* "Sudden and unexplained change . . . may be 'arbitrary, capricious [or] an abuse of discretion.'" *Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735, 742 (1996) (quoting 5 U.S.C. § 706(2)(A)). In short, BLM "must cogently explain why it has exercised its discretion in a given manner." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 48-49. In light of the incongruity discussed above, BLM has not done so.

Defendants argue that their reliance on administrative actions to protect the Monument is supported by case law. The Court does not agree. In each of the cases

cited by Defendants, the court upheld BLM's decision because BLM had taken at least some concrete steps to protect Monument objects. *See Mont. Wilderness Ass'n*, 725 F.3d at 1000-01 (finding that BLM's decisions regarding airstrips and roads adequately protected monument objects because BLM had closed numerous airstrips and miles of roads); *W. Watersheds Project*, 719 F.3d at 1045 (emphasizing that the RMP had placed "specific restrictions on grazing near sage-grouse leks during the breeding season"); *Wilderness Soc'y v. U.S. Bureau of Land Mgmt.*, 822 F. Supp. 2d 933, 938-39 (D. Ariz. 2011) (finding BLM "restrict[ed] allowable uses in the Monuments, particularly with respect to transportation, grazing, and recreation" by closing thousands of acres to these activities), *aff'd*, 526 F. App'x 790 (9th Cir. 2013). The Court cannot conclude that the unevaluated administrative actions adopted by BLM in this case are comparable.

## IV.     Stand Alone APA Claim.

Count IV of the complaint alleges a separate claim for "violation of the APA." Doc. 1, ¶¶ 99-103. Plaintiffs seek summary judgment on this claim. Doc. 33 at 27-28. Plaintiffs argue that they are able to seek relief for an agency's violation of the APA regardless of whether the agency violated an underlying statute. *Id.* The Court disagrees. As Defendants correctly point out, "[t]here is no right to sue for a violation of the APA in the absence of a 'relevant statute' whose violation 'forms the legal basis for [the] complaint.'" *El Rescate Legal Servs., Inc. v. Executive Office of Immigration Review*, 959 F.2d 742, 753 (9th Cir. 1991) (quoting *Nat'l Wildlife Fed'n*, 497 U.S. at 883). The Court will grant summary judgment to Defendants on Count IV.

## V.     NEPA.

Plaintiffs claim that the Final EIS violates NEPA by containing an inadequate analysis of mitigation measures for recreational shooting and an inadequate analysis of the cumulative impacts of shooting and other activities. The Court agrees.

### 1.     Legal Standard.

"NEPA 'is our basic national charter for protection of the environment.'" *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1185 (9th

Cir. 2008) (quoting 40 C.F.R. § 1500.1(a)); *see* 42 U.S.C. § 4331.  "NEPA seeks to make certain that agencies will have available, and will carefully consider, detailed information concerning significant environmental impacts, and that the relevant information will be made available to the larger [public] audience."  *N. Idaho Cmty. Action Network v. U.S. Dep't of Transp.*, 545 F.3d 1147, 1153 (9th Cir. 2008) (internal quotes omitted).  The statute establishes factors to be considered in agency action, but does not mandate a particular substantive result.  *Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 558 (1978).

A key procedural requirement of NEPA is the preparation of an environmental impact statement ("EIS").  *City of Carmel-By-The-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1150 (9th Cir. 1997).  In reviewing an EIS, courts apply a "rule of reason" and determine whether the EIS contains "'a reasonably thorough discussion of the significant aspects of the probable environmental consequences.'"  *Id*. at 1150 (quoting *Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1519 (9th Cir. 1992)).  NEPA "dictates that [courts] defer to agency opinion if it is not otherwise shown to be arbitrary or capricious."  *Id*. at 1151-52 (citations omitted).

## 2. Mitigation Measures.

"Implicit in NEPA's demand that an agency prepare a detailed statement on 'any adverse environmental effects which cannot be avoided should the proposal be implemented,' is an understanding that the EIS will discuss the extent to which adverse effects can be avoided."  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351-52 (1989) (quoting 42 U.S.C. § 4332(C)(ii)).  Federal regulations also require an EIS to discuss appropriate and possible mitigation measures.   40 CFR §§ 1502.14(f), 1502.16(h), 1508.25(b).  Although a "mitigation plan need not be legally enforceable, funded or even in final form to comply with NEPA's procedural requirements," *Nat'l Parks & Conservation Ass'n v. U.S. Dep't of Transp.*, 222 F.3d 677, 681 n.4 (9th Cir. 2000), the EIS still must discuss mitigation "'in sufficient detail to ensure that environmental consequences have been fairly evaluated,'" *City of Carmel-By-the-Sea*,

123 F.3d at 1154 (quoting *Robertson*, 490 U.S. at 352-53).

"[T]he distinction between inadequate and adequate . . . mitigation discussions 'appears to be one of degree.'" *High Sierra Hikers Ass'n v. U.S. Dep't of Interior*, 848 F. Supp. 2d 1036, 1053 (N.D. Cal. 2012) (quoting *Okanogan Highlands Alliance v. Williams*, 236 F.3d 468, 476 (9th Cir. 2000)). "A mere listing of mitigation measures is insufficient to qualify as the reasoned discussion required by NEPA." *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1380 (9th Cir. 1998) (quotation marks and citation omitted). Furthermore, "[a]n essential component of a reasonably complete mitigation discussion is an assessment of whether the proposed mitigation measures can be effective. . . . A mitigation discussion without at least *some* evaluation of effectiveness is useless in making that determination." *S. Fork Band Council Of W. Shoshone Of Nevada v. U.S. Dep't of Interior*, 588 F.3d 718, 727 (9th Cir. 2009) (emphasis in original; citations omitted). The Court must be "satisfied that the agency took the requisite 'hard look' at the possible mitigating measures." *Okanogan*, 236 F.3d at 473.

As discussed above, BLM proposes a list of administrative actions to mitigate damage to the Monument from recreational shooting. A.R. 20576-77. These include the possibility that BLM may issue supplementary rules that restrict shooting to daylight hours, limit the types of targets, and require persons to remove all debris produced by shooting. *Id.* The Final EIS also includes a list of best management practices that encourage shooters to select a site with a safe backstop, downrange safety fan, and an appropriate distance from other visitors. A.R. 22083-86, 23936-38. BLM left open the possibility of closing part or all of the Monument to shooting if these administrative actions prove ineffective. A.R. 20384.

What is lacking in this discussion of mitigation measures, however, is "at least *some* evaluation of [the] effectiveness" of the measures. *S. Fork Band Council*, 588 F.3d at 727 (emphasis in original). The Court has reviewed every record citation provided by Defendants on this issue, and several additional portions of the record, and can find no

evaluation of the effectiveness of the proposed mitigation measures.  As already noted, the Final EIS does state that "*if* Management and Administrative Actions designed to change the conduct of recreational target shooters has [sic] the desired effect, impacts from recreational target shooting should be greatly decreased."  A.R. 20864-65, 20895, 20966, 21005, 21052, 21341 (emphasis added).  But this is not an analysis of the measures' effectiveness; it is a statement of what BLM hopes will happen.

The Final EIS repeats this statement when addressing a diverse array of problems that may arise from recreational shooting, including "the risk of lead contamination in soils from bullets [and] the potential migration of that lead into surface and subsurface water systems," A.R. 20950; the loss of "naturalness and opportunities for solitude where spent shells, targets, and trash or gunfire degrades the landscape," A.R. 20979; and a "concern over the safety of specific shooting locations and practices and the use of automatic weapons," A.R. 21257.  But nowhere does the document evaluate whether the proposed mitigation measures will in fact decrease these problems.  This is not the kind of "hard look" that NEPA requires.

The Court finds two cases instructive.  In *Neighbors of Cuddy Mountain v. U.S. Forest Service*, the Forest Service proposed mitigation measures to off-set the damage that a sale of timber might inflict on the habitat of redband trout.  137 F.3d at 1380.  The damage involved increased sediment in three creeks.  *Id.*  As described by the Forest Service, the "[o]ffsetting mitigation would include such projects as riparian enclosures (fences around riparian areas to keep cattle out) and fish passage restoration (removing fish passage blockages).  These activities can be effective but cannot be quantified with present data." *Id.*  The court found this to be a perfunctory description – a mere listing of mitigation measures – and therefore insufficient under NEPA.  *Id.*  The court emphasized:

> Forest Service did not discuss which (or whether) mitigating measures might decrease the increased sedimentation in the three creeks affected by the timber sale. . . .  Nor has the Forest Service provided an estimate of how effective the mitigation measures would be if adopted, or given a reasoned explanation as to why such an estimate is not possible.

*Id.* at 1381.

In *Okanogan Highlands Alliance v. Williams*, the Forest Service proposed mitigation measures to off-set the damage that a new gold mine might cause to the nearby waters.  236 F.3d at 473-74.  The Forest Service found that the mine might affect the water quality in groundwater and the mine-pit lake, and that the mine's waste-rock dumps could exacerbate the problem.  *Id.* at 474-75.  If these problems emerged, the EIS proposed concrete steps to mitigate the damage, such as the installation of water treatment systems and the use of sediment traps in waste rock areas.  *Id.*  The EIS also gave an effectiveness rating to each proposed mitigation measure.  *Id.*  The court found this discussion sufficient: "Each mitigating process was evaluated separately and given an effectiveness rating. . . .  Because the actual adverse effects are uncertain, and the EIS considered extensively the *potential* effects and mitigation processes, we conclude . . . that the discussion of mitigating measures in the EIS is adequate."  *Id.* at 477 (emphasis in original).

The present case is similar to *Cuddy Mountain*.  The Final EIS simply does not evaluate the effectiveness of its mitigation measures.  *See Cuddy Mountain*, 137 F.3d at 1381.  Unlike *Okanogan*, the Final EIS does not give an "effectiveness rating" to its proposed measures or in any other way attempt to determine whether they will actually reduce shooting-related harms to the Monument.  Furthermore, although the Forest Service in *Okanogan* was not yet certain that the gold mine would damage water quality, it developed an extensive set of mitigation measures in case the damage occurred.  Here, BLM knows that recreational shooting is causing significant damage to Monument objects, but has developed only aspirational mitigation measures and has not attempted to evaluate their effectiveness.

Defendants argue that they are entitled to implement the new rules and then assess their effectiveness.  They emphasize that they have left open the possibility of closing the Monument to shooting in the future.[7]  This proposed wait-and-see approach undermines

---

[7] For the proposition that the EIS may leave the mitigation measures unclearly

the purpose of NEPA.  As the Supreme Court has explained, without a "reasonably complete discussion of possible mitigation measures . . . neither the agency nor other interested groups and individuals can properly evaluate the severity of the adverse effects" of a proposed action.  *Robertson*, 490 U.S. at 352.  As written, the Final EIS provides no insight into the effectiveness of the mitigation measures and, therefore, into the severity of the adverse effects that will flow from BLM's decision.

Defendants also argue that they were unable to assess the effectiveness of their proposed measures because "that sort of analysis is extremely difficult for rules regulating shooter conduct.  The effectiveness of those rules depends on the effectiveness of BLM's public education and outreach efforts and on shooter cooperation and enforcement."  Doc. 35-1 at 23.  But if an EIS fails to estimate the effectiveness of a mitigation measure, it must give a "reasoned explanation as to why such an estimate is not possible."  *Cuddy Mountain*, 137 F.3d at 1381.  The Final EIS does not provide this reasoned explanation, and Defendants cannot cure that deficiency by attempting to provide an explanation in their litigation briefs.  The Court "may not accept . . . counsel's *post hoc* rationalizations for agency action."  *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 50.

Because the Final EIS lacks an evaluation of the effectiveness of the mitigation measures, and this evaluation is an "essential component of a reasonably complete mitigation discussion," *S. Fork Band Council*, 588 F.3d at 727, the Court finds the Final EIS's discussion of mitigation measures inadequate under NEPA.

### 3.   Cumulative Impacts.

Plaintiffs argue that the Final EIS's discussion of cumulative impacts is inadequate because it fails to analyze how target shooting in conjunction with livestock grazing, travel decisions, off-highway vehicle ("OHV") use, and other activities will impact

---

defined so that the agency can adapt them to changing circumstances, Defendants rely on *Wilderness Soc'y v. U.S. Bureau of Land Mgmt.*, 822 F. Supp. 2d 933 (D. Ariz. 2011), and *Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497 (D.C. Cir. 2010). This proposition is true for "general planning documents," *Wilderness Soc'y*, 822 F. Supp. 2d at 944, that is, documents that lay the groundwork for future decisions that may require mitigation.  But in this case BLM made a specific decision – to allow shooting – and therefore should have considered mitigation measures specific to that decision.

1   Monument objects.  Doc. 33 at 31-33.  As an example, Plaintiffs argue that the Final EIS

2   does not analyze the cumulative impacts of target shooting and other activities on the

3   Sonoran desert tortoise.  Although this is a closer question than those addressed above,

4   the Court agrees.

5        An EIS must discuss the cumulative impact of a proposed agency action on the

6   environment.  *Mont. Wilderness Ass'n*, 725 F.3d at 1001.  Cumulative impact "results

7   from the incremental impact of the action when added to other past, present, and

8   reasonably foreseeable future actions regardless of what agency . . . or person undertakes

9   such other actions.   Cumulative impacts can result from individually minor but

10  collectively significant actions taking place over a period of time."  40 C.F.R. § 1508.7.

11  An EIS's analysis of cumulative impacts "must give a sufficiently detailed catalogue of

12  past, present, and future projects, and provide adequate analysis about how these projects,

13  and differences between the projects, are thought to have impacted the environment."

14  *Lands Council v. Powell*, 395 F.3d 1019, 1028 (9th Cir. 2005).

15       The Final EIS contains a 33-page analysis of cumulative impacts.  A.R. 21309-42.

16  This analysis mentions the effects of shooting in the Monument only with respect to

17  cumulative impacts on cultural and heritage resources.   A.R. 21325, 21330, 21334,

18  21338, 21341.   Cultural and heritage resources appear to include scientifically and

19  historically significant sites within the Monument.  *See* A.R. 20835.  The Final EIS does

20  not analyze the cumulative impacts of shooting and other activities on wildlife, including

21  the Sonoran desert tortoise.  The Final EIS lacks this analysis even though Appendix G

22  notes the potential impacts of shooting on the tortoise:

> The desert tortoise excavates and inhabits burrows in rocky hillsides against
> which target shooters often place targets. Sustained target shooting may
> cause direct mortality to desert tortoise and indirect impacts to tortoise
> habitat through loss of forage and cover due to damage or loss of
> vegetation, increased vulnerability to predation as predators are attracted to
> areas of trash and garbage, and ingestion of plastic and other trash.

27  A.R. 22028.

28       The cumulative-impacts analysis does contain a section discussing the cumulative

- 20 -

impacts of various activities on wildlife.  *See* A.R. 21325-26.[8]  The section states that the "Desert Tortoise Range Wide Plan . . . provides habitat protection and conservation for many of [the protected] species on federal land[.]"  *Id.*  The section further finds that human population growth "would likely lead to further loss and fragmentation of habitats for protected species from development and the increased demand for recreation," *id.*, although current livestock grazing plans would have negligible to minor impacts, A.R. 21326.  The section concludes that "[o]verall, the long-term decline in native vegetation and special status species habitats due to land uses would continue under Alternative A within the [Monument] and cumulatively the effects would range from minor to major for wildlife species in general."  *Id.*[9]

This analysis of cumulative impacts on wildlife and the Sonoran desert tortoise is helpful, but its failure to discuss the potentially significant damage of shooting on wildlife – damage highlighted in Appendix G – renders it insufficient.  A reader is left uncertain of the cumulative impacts of *all* activities to be permitted under the ROD, including target shooting, on wildlife.  Thus, while this analysis does contain more than "perfunctory references" to cumulative impacts, it nevertheless is not "'useful to a decisionmaker in deciding whether, or how, to alter the program to lessen cumulative environmental impacts.'"  *City of Carmel-By-The-Sea*, 123 F.3d at 1160 (quoting *Natural Resources Defense Council, Inc. v. Hodel*, 865 F.2d 288, 299 (D.C. Cir. 1988)).  And while Defendants are correct that BLM "has discretion in deciding how to organize and

---

[8]  This section is under Alternative A, the no-action alternative.  Although Alternative A was not adopted in the ROD, Alternative E (the chosen alternative) incorporates this analysis.  A.R. 21341 ("Current regional conditions and threats to special status species would be the same as described for Alternative A, C and D. However alternative E provides a balance through multiple uses and incorporates a better approach to manage key ecosystems and special status species habitats while providing opportunities for resource uses that meet social and economic needs.").

[9]  There are other sections of the Final EIS that discuss impacts on the Sonoran desert tortoise.  For example: "Several of the [areas of critical environmental concern] contain noise or human activity-sensitive areas of wildlife habitat and species (e.g., desert tortoise, Sonoran pronghorn, bighorn sheep[)] for which, increased noise levels and human activity can have a substantial impact," A.R. 21313; "[S]tringent Sonoran desert tortoise habitat protection stipulations are anticipated.  Mostly, these actions would protect or even enhance wilderness characteristics," A.R. 21316.

present information in an EIS," *Montana Wilderness Ass'n*, 725 F.3d at 1002, this does not excuse BLM from taking the requisite "hard look" at the cumulative impacts of all relevant activities on wildlife, *Cuddy Mountain*, 137 F.3d at 1379.

The ROD and Final EIS are notable for their decision to allow shooting throughout the Monument, particularly in light of the incongruous information that shows much damage from shooting. It was particularly important, therefore, that BLM consider not only the effects of continued shooting, but the cumulative effects. Failure to do so was a violation of NEPA.

**VI.   Remedy.**

In their motion for summary judgment, Plaintiffs request three forms of relief: (1) a declaration that BLM violated FLPMA and NEPA; (2) a remand of this matter so that BLM may issue a new decision and analysis consistent with this order; and (3) an injunction on recreational shooting inside the Monument (or portions of the Monument) pending a new decision and analysis. Doc. 33 at 33. At oral argument, Plaintiffs withdrew their request for an injunction.

The Court will vacate the portions of the ROD and the Final EIS that permit recreational target shooting throughout the Monument and remand to BLM for reconsideration of that decision in light of the shortcomings identified in this order. The Court also requires BLM to ensure that the Final EIS's analysis of mitigation measures and cumulative impacts be consistent with this order.

**IT IS ORDERED:**

1.   Plaintiffs' motion for summary judgment (Doc. 32) is **granted** as to their claims that Defendants violated FLPMA and NEPA.

2.   Defendants' motion for summary judgment (Doc. 35) is **granted** as to Plaintiffs' claims that Defendants violated the APA standing alone.

3.   The Court vacates the portions of the ROD, RMP, and Final EIS that permit recreational target shooting throughout the Monument and remands to BLM for reconsideration of that decision in light of the shortcomings

identified in this order.  The Court also requires BLM to ensure that the Final EIS's analysis of mitigation measures and cumulative impacts be consistent with this order.

4.      The Clerk is directed to terminate this action.

Dated this 27th day of March, 2015.


_____
David G. Campbell
United States District Judge